## ALSTON and wife *vs.* JONES and others.

Where, upon a feigned issue to try the questions whether an instrument pur-
porting to be the last will and testament of J. M., deceased, and dated Sep-
tember 26, 1839, was his last will and testament; and whether J. M., at the
time of making and subscribing the same, was of sound mind, and capable
of making a will, the evidence was, that as early as the 10th or 12th of Sep-
tember, 1839, J. M. was conscious that he must die soon, and that he might
die at any moment; that the subject of making a will was thought of by
him, and down to and including the 22d he had determined not to make
one; that he was in the full possession of his intellect down to that day;
that from the 22d until the afternoon of the 25th his body and mind rap-
idly decayed; that on the night of the 25th and until 10 o'clock on the
26th his mind wandered, and was in the past and not in the present; that
he talked incoherently, and spoke of subjects as being present which
were not present, and of the existence of facts which were not facts; that
at half past 11 o'clock on the 26th the instrument in question was
brought to J. M. by S., an attorney, who had been requested by other
persons to draw up a will for him, and after being read to him by S.
was signed by J. M. not more than fifteen minutes before his death, and
while he was in bed, supported by pillows; *Held*, that the jury were justi-
fied in finding that J. M. was not competent to make a will, and that the
instrument in question was not his last will and testament; notwithstand-
ing there was some evidence tending to show that during the reading and
execution of the paper J. M. was in the possession of a disposing mind
and memory. MITCHELL, P. J., dissented.

The verdict of a jury will not be set aside for misdirection of the judge, if
from the evidence in the cause the court sees the result would have been
the same, whether the objectionable directions had been given or not; or
where the evidence in the cause warrants the verdict.

MOTION by the defendants, upon a case, to set aside the
verdict of a jury, and for a new trial. Among the questions
submitted to the jury for their answer, were the following:
1. Is the paper writing, purporting to be the last will and testa-
ment of John Mason, deceased, dated the 26th of September,
1839, the last will and testament of John Mason, deceased?
2. Was the said John Mason, at the time of the making and
subscribing or acknowledging by him of such paper writing, of
sound mind and memory, and in all respects capable of making
a will? These questions the jury answered in the negative.

The present application was made upon two grounds: 1. Mis-

Alston *v.* Jones.

direction of the justice who presided at the trial; 2. That the verdict was against the weight of evidence.

*Wm. Fullerton,* for the plaintiffs.

*G. T. Strong,* for the defendants.

Morris, J. The verdict of a jury will not be set aside for misdirection of the judge if, from the evidence in the cause, this court see the result would have been the same, whether the objectionable directions had been given or not; or where the evidence in the cause warrants the verdict. (*Depeyster* v. *Columbian Insurance Co.,* 2 *Caines' R.* 85. *Dean* v. *Hewit,* 5 *Wend.* 257. *Dole* v. *Lyon,* 10 *John. R.* 447. *Jackson* v. *Timmerman,* 12 *Wend.* 299.)

The facts in this case as established by the evidence are the following. In 1836, Mr. John Mason, upon the death of one of his sons, cancelled a will, which he had previously made, and which had been drawn by and deposited with Vice Chancellor McCoun. At the time he cancelled that will, Mr. Mason told Vice Chancellor McCoun he would at some future day call and get him to draw another will for him. Subsequently to this, upon various occasions, and before the spring of 1839, in casual conversations with Vice Chancellor McCoun, Mr. Mason alluded to the subject of having Vice Chancellor McCoun draw a will for him; to which Mr. McCoun always in substance replied, "Whenever you desire it to be done call at my office, where you will find me of evenings and I will attend to it for you." During this same period Mr. Mason had several conversations with a friend and relative of his, Mr. John G. Jones, in which the litigation upon the Lorillard will, its result, and the difficulty of making a will that would stand legal tests, were the topics of conversation. In some of these conversations Mr. Jones stated that "the revised statutes made a good enough will for any man; that he (Jones) had made his will according to the provisions of the revised statutes as near as it could be made." Mr. Mason observed, "He thought a person might in a preamble to his will

give his opinion of his heirs, and then he should be allowed to divide his property among them as he pleased." During the same period Mr. Mason freely expressed his conviction of his sons' want of business capacity, and of their propensity to spend money; and as freely proclaimed the high estimation in which he held his daughters, and the estimation in which he held his different sons-in-law. All this occurred before the spring of 1839. After the spring of 1839 and before the afternoon or evening of September 25th, 1839, (the evening before his death,) there is no evidence of any act or declaration of Mr. Mason showing he either contemplated or desired to make a will; but on the contrary there is strong negative evidence showing he had determined to die without leaving a will. In the summer of 1839, the symptoms of the disease of which Mr. Mason died exhibited themselves in him, though they were not then so recognized. On the 10th or 12th of September, 1839, Mr. Mason took to his room and bed, and remained there until his death, which occurred on the 26th of the same month. On the occasion of Mr. Mason taking to his room and bed, Dr. Berger, for many years his family physician, was sent for. He called, and from examination discovered, and so informed Mr. Mason, that his disease was that of the heart. To this information Mr. Mason promptly replied, "I then know, doctor, that neither you nor any one else can help me;" and immediately stated, "I regret I have not made a will." The subsequent evidence in the case shows that this "regret" that he had not "made a will" was not an expression either of a desire, or the determination, to make a will if he could; but was rather the exclamation of a controlling spirit shocked by the sudden conviction that his days were numbered, expressing doubt whether he had done right in having determined not to make a will; and is conclusive proof that he fully appreciated his situation, and that if he desired to make a will, he knew he must make it immediately. Dr. Berger at the same time informed Mrs. Jones, who was present, the sister or sister-in-law of Mr. Mason, and the family, that Mr. Mason might die at any moment. Dr. Berger sat up with Mr. Mason that night, and states his condition and symp-

Alston *v.* Jones.

toms were such that he then supposed he might pass off at any moment. From this night down to his death, he suffered severely from the pain of his disease, in paroxysms of hours duration, which sometimes continued for the entire night; and these attacks became more frequent and of longer duration, and progressively weakened him. Mr. Mason, from the first night Dr. Berger visited him, was perfectly aware of his situation, and that he might expire at any moment. From the 10th or 12th of September to and including the 22d of the same month, some friends not of his immediate family visited him, and their evidence establishes that down to and including the 22d of September, Mr. Mason's conversation and acts exhibited his accustomed strong practical judgment. Among these visitors were Vice Chancellor McCoun and Mr. John G. Jones: the same Mr. Jones with whom Mr. Mason, prior to the spring of 1839, had conversed upon the subject of a will; and to Vice Chancellor McCoun, before that spring he had said he would, when he wished a will drawn, call upon him to draw it. With both these gentlemen he conversed upon business. The business Vice Chancellor McCoun had with him was in relation to a declaration of trust in favor of one of Mr. Mason's sons, of a farm on Long Island, which Mr. Mason had paid for, and the title had been taken in Vice Chancellor McCoun's name. Mr. Mason directed alterations to be made in the declaration of trust.

Here was Mr. Mason, in the full possession of his intellect, conscious that he might die at any moment, and that he must die in a few hours at the farthest, and that no human means could prolong his life, conversing with the man of all others to whom he would confide the drawing of his will, and yet he did not allude to the subject of a will. Would he have thus acted unless at that time, from mature deliberation, he had determined to die without a will? I think he would not. At this time, as late as the 22d, Mr. Mason could lie upon his back with his head raised *only* with his pillows, and there had been no wandering of his mind: he had not talked incoherently; he had not spoken of things and objects as being present which were not there; he had in all respects, under every circumstance, down to and includ-

ing this 22d of September, shown the full possession of his usual strong practical intellect. After the 22d, the evidence shows, his condition, physical and mental, was much impaired. After the 22d, Mr. Mason was seen by no person except his two daughters, Mrs. Isaac and Colford Jones; his two sons-in-law, Isaac and George Jones; Dr. Berger, Dr. Van Rensselaer, Mr. Strong, and the domestics. The evidence shows that after the 22d he was so ill that they refused his sister Mrs. Jones and his friend and former partner Mr. Hasburgh access to him; and that after the 22d and before the afternoon of the 25th of September, they were obliged to raise Mr. Mason to a sitting position upon his bed, with pillows and a chair behind him, and with a rope or board in front of him to prevent his leaning over forward. He wandered in his mind; would hold his hands to his head, as if thinking intently, and would talk incoherently. After the 22d and before the 25th, Mr. H. W. Field saw Mr. John G. Jones at the Chemical Bank; Mr. John G. Jones informed Mr. Field of Mr. Mason's situation, and also that Mr. Mason had not made a will. Mr. Field suggested to Mr. John G. Jones that Mr. Mason ought to make a will, if only appointing executors, to save the necessity of getting security for administrators. This suggestion Mr. John G. Jones repeated to Mr. Isaac Jones, who then got from Mr. Strong the draft of a will only appointing executors, for Mr. Mason to sign. When Mr. Isaac Jones applied to Mr. Strong to make this draft will, he told Mr. Strong that Mr. Mason was very ill; that they had discovered Mr. Mason had no will by him; that he had not alluded to the subject of making a will; that he, Mr. Jones, wanted this will ready, so that should Mr. Mason mention the subject of making a will, they might have one ready for him to sign. Mr. Strong drew the will and gave it to Mr. Isaac Jones. These last transactions could not have occurred earlier than the 23d, for on the 22d Mr. John G. Jones saw Mr. Mason for the last time, and his evidence conclusively leaves the impression that this interview with Mr. Field was after he had seen Mr. Mason for the last time.

This will, only appointing executors, must have gone into the hands of the family on the 23d, and must also have then gone

Alston v. Jones.

into the hands of Mrs. Colford Jones; for the evidence shows neither of the Messrs. Jones ever had any conversation with Mr. Mason about a will. Therefore Mrs. Colford Jones had this prepared will in her hands from the 23d until the afternoon of the 25th, before Mr. Mason either assented to make a will or gave instructions for drawing one. On the 25th, at 6 o'clock in the evening, Messrs. Isaac and George Jones called on Mr. George W. Strong, and asked him to draw a will for Mr. Mason to execute. They stated they had not received the instructions from Mr. Mason, but had received them from Mrs. Colford Jones, who said she received them from Mr. Mason. They stated they had looked for Mr. Strong in the afternoon, and not being able to find him, had returned to Mrs. Colford Jones and heard the instructions repeated to them, that they might not make a mistake. They each gave Mr. Strong instructions, neither repeating what the other stated. Mr. Strong promised to have the draft prepared for the examination of the Messrs. Jones by 7 o'clock the next morning, when they were to call at his office, and which was the only appointment he that night made with them. Dr. Berger testified, that on the evening of the 25th Mr. Mason told him that Mr. Strong would come the next day and bring his will, and he desired the doctor to be a witness to it. This statement of Mr. Mason, that Mr. Strong would be there the next day, was not founded in fact, because at that time Mr. Strong had made no appointment to be there; the only appointment made by him was with the Messrs. Jones, to meet them at his office in the morning at 7 o'clock to examine the draft of the will.

During the night of the 25th, the evidence establishes that Mr. Mason had a continuous paroxysm of pain; that a part of the time he was speechless, and did not know what was occurring; that "they had to rub him with brandy to bring him to;" that Dr. Berger alongside of the bed, in tones sufficiently loud to have been heard by Mr. Mason had he been sensible, stated to Mr. Isaac Jones, "it was useless to give Mr. Mason any thing; that all that could be done, was to let him be as quiet as he could." On the morning of the 26th of September, the Messrs. Jones, according to appointment, called at Mr. Strong's

office at 7 o'clock, and had the draft will read over to them. After the will was read and approved by them, there were great exertions made to obtain its immediate engrossment, in which efforts the Messrs. Jones participated.    There was no time specified when the will would be engrossed; no time appointed at which Mr. Strong would be at Mr. Mason's with the engrossed will.    Mr. Isaac Jones remained some time at Mr. Strong's office door with a carriage to take Mr. Strong with the will, as soon as it should be engrossed, to Mr. Mason's house.    When the will was finished Mr. Isaac Jones had left, and Mr. Strong was obliged to procure a hackney coach to take him to Mr. Mason's. During the morning of the 26th of September, while the transactions were occurring at Mr. Strong's office, the evidence shows the following facts and incidents transpired in Mr. Mason's bed room.    Dr. Berger had been with Mr. Mason all night and remained with him until about six o'clock, when he left.    He returned between eight and nine o'clock; stayed a short time with him, then went away and returned again about half-past ten o'clock, and remained with him until he died.    Dr. Berger testifies that when he was leaving Mr. Mason upon one of these occasions, that morning, "Mr. Mason requested me to be present at about 12 o'clock on that day, to witness his will.    When I went away I said I would go and pay my visit, and endeavor to be back when the gentlemen would be there to sign his will." Dr. Berger does not state when this conversation took place— whether before he left at six o'clock, or before he left at a little past nine o'clock.    In either event, however, Mr. Mason could not have had reason to know the hour Mr. Strong would be there with the will, because Mr. Strong did not know: he had made no appointment upon the subject; and the Messrs. Jones were then down town assisting Mr. Strong to procure a copyist, and were waiting to bring Mr. Strong up.

The condition of Mr. Mason physically and mentally on that morning as described by the witnesses, and in the order of time spoken of, was as follows: "Mary Gillan was in the room early in the next morning (26th) at 6 or half past 6, or it might have been earlier; he was half sitting up in bed against a chair be-

Alston *v.* Jones.

hind him with pillows to support him, with a piece of board in front to support him to keep him from leaning over. He appeared weak, and his eyes run water a good deal." "At that time in the morning he was praising the coachman, saying he was a good coachman for working so hard. Mr. Mason's window looked into the yard towards the stable. It was not the fact, the coachman was not there. He said he was a faithful coachman; he spoke as if he saw the coachman there at his work; the coachman was not there at all. I noticed Mr. Mason was mistaken; did not tell Mr. Mason of his mistake; did not like to contradict him." Ellen Graham "was twice or thrice in Mr. Mason's room on the day he died. First went in about breakfast time; went in to see if he wanted any thing, and to see how he did; Mary Gillan was in the room; she was wiping his face; thinks the witness spoke to him; thinks Mr. Mason made no answer; he raised his head a little but did not answer; he appeared to be very low, did not appear to take much notice of any thing." Mary Murphy "was in his room on the day he died, for a few moments only; Mr. Mason was talking or muttering to himself; cannot exactly tell how long he talked and muttered to himself; she noticed Mr. Mason's eyes ran water; she saw nothing else peculiar about him." Dr. Jeremiah Van Rensselaer, on the morning Mr. Mason died, went into his room after breakfast and before 9 o'clock. "Mr. Mason was seated in bed; and a woman not far from him between him and the fire-place, that he took to be the nurse. Witness addressed Mr. Mason; said 'How do you do sir.' He knew witness; said 'How do you do sir,' or 'how do you do doctor.' He then said something about horses in the yard; witness asked the woman what he meant by it; she replied, he thought all the morning that the man had the horses in the yard; witness asked the servant if the man had the horses in the yard, at the same time witness advanced to the window and looked into the yard himself; the woman smiled, and said he did not know what he was saying; he often wandered; witness felt very sorry and left the room; when witness looked, he saw there were no horses in the yard. It was very evident Mr. Mason did not understand

what he, Mr. Mason, was speaking about." "Considered Mr. Mason a very ill man; understood he died that day, lived next door and heard of the death immediately after it occurred. Mr. Mason did not appear capable of carrying on a conversation at that time." Ellen Graham again went in, between 11 and 12 o'clock. "Mrs. Jones called her in to bring a coverlid for Mr. Mason's bed, for there were two gentlemen coming, in a few minutes; she laid the coverlid on the foot of the bed; at this time she thought he was dying; he was much lower than before; he was lying over in his usual manner with a stick or rope in front; he could not lie down; he appeared to be dying; he appeared to her as if he could not speak at all; he might roll his head around; he did not appear in much agony; this second time she did not, nor did any one else speak to him, nor did she hear him speak; the water was running out of his eyes both times; his eyes were glassy, like death; I don't think he looked up or noticed me; his face and eyes were not natural as she had seen them before. Mrs. Jones' manner was this: she told her to go straight out and let no person in, as these gentlemen were expected." At the conclusion of this last testimony Mrs Jones was left alone with her father. The next fact in order of time is this. Mr. Strong testified, "I reached Mr. Mason's house a little or somewhat after 11 o'clock; it might have been more than half past 11 o'clock, but I do not think it was so late, because, after the will was executed and I had left the house, I looked at my watch, and it wanted a few minutes to 12; I think two or three minutes, but I cannot judge accurately as to the length of time I was in the house." Upon Mr. Strong's reaching the house he was met by Mr. Isaac Jones, and immediately by him conducted to Mr. Mason's room. He then, when he first went in, saw Mr. George Jones and Dr. Berger. "He was not formally introduced to Mr. Mason, for they had known each other for many years. Mr. Mason was sitting up, supported by bolsters at his back." "I think I spoke to Mr. Mason, asked him how he did, and told him I had prepared a will for him which I had brought, and asked him if I should read it to him." "I do not recollect positively" whether Mr.

Mason answered either or both these questions, "but my impression decidedly is, that he requested me to read the will to him." "I cannot say positively" that he signified such request by words, "but my impression is that he signified his request by words, but what these words were I do not recollect; perhaps I ought to add, that during my stay in his room I discovered no difficulty in his speech; my impression decidedly is, that he requested me to read the will; that is, in answer to my question whether I should read it, he said yes, or something to that effect; I do not believe that I derived a knowledge of his assent to my reading the will from his looks or gestures merely, and yet I ought to add that I cannot recall the precise circumstances to my present recollection." After addressing these questions to Mr. Mason and receiving the answers, "I immediately proceeded to read the will, standing by his side." "I endeavored to, and I believe I did, read the will audibly, correctly and distinctly; but at the same time, having noticed that Mr. Mason appeared to labor very much in breathing, and understanding that he was near his end, I read it with as much rapidity as I deemed to be compatible with a sense of my duty in reading the will to him; it was while I was reading the will, that the two ladies [Mrs. Isaac and Colford Jones,] came into the room, and I observed after I had finished the reading the will that they had left the room. I did not see the ladies until they came into the room while I was reading the will."

"I read the will through without pausing; and having done so, I asked Mr. Mason in reference to the whole, and not to any particular part of it, whether he understood it, to which he answered that he did. I then asked him if it was correct; he said it was; and in answer to one of these questions, I am not sure which, but think it was the first, he said, perfectly." "I cannot charge my mind with the precise words, [he used in answer to the question, 'was it correct,'] but it was either yes, or some other expression tantamount to that, conveying an unqualified assent to it." "Immediately, [after the will was read,] Mr. Mason directed a large book, to which he pointed, to be brought and laid before him, and directed, as I well recollect, the particular

Alston *v.* Jones.

manner in which the book should be placed before him; the will was then spread before him on this large book, and a pen and ink handed to him, when he signed the will. After having signed it, I asked him two questions; first, whether he acknowledged that to be his last will and testament? to which he answered yes, or some expression tantamount to that; I cannot charge my mind with the very words he used. And second, whether he requested Dr. Berger and myself to witness it; to which he assented in some manner. Doctor Berger and myself became the subscribing witnesses, which was done immediately in the room, and in the presence of the testator; *and I recollect that Mr. Mason immediately after asked for a tumbler of water, which, I think, Dr. Berger handed to him;* I then handed the will to Mr. George Jones, and then left the room, and never saw Mr. Mason after. I am familiar with the manner in which wills are usually executed, and this was in all respects executed in the usual manner." "I should say [the will was executed] not far from 10 minutes to 12 o'clock; it did not exceed 15 minutes" from 12 o'clock. "I cannot answer with precision, [how long I was in Mr. Mason's room,] because I cannot tell how long it took me to read the will; the principal time was occupied in reading and executing the will; it probably was from twenty minutes to half an hour. I do not know that I can answer the question with more precision than that." "When I had left the house I looked at my watch, and it wanted a few minutes to 12 o'clock; I think two or three minutes." Doctor Berger's testimony in relation to the execution of the will, and the attendant circumstances, is substantially the same with that of Mr. Strong. Dr. Berger testified, "I gave him a drink a minute or two before he died, which he asked me for." "I should think about an hour before, I gave him his next previous drink." Doctor Berger and Mr. Strong both testify that, in their opinion, Mr. Mason was, at the time he executed the will, of sound mind, and that he understood the will. Dr. Berger testified, "that at the time Mr. Mason died, he (Dr. Berger) and Mr. George Jones were in the room. I think there were others present, but am not certain." "He died about 1 o'clock, or ¼ past one o'clock.

Alston *v.* Jones.

I cannot recollect the time exactly." "I should think [Mr. Mason died] *three quarters* of an hour, *or less*," after Mr. Strong left the room.

Mary Murphey testified, "When she was going down stairs for a drink for Mr. Mason, she saw two gentlemen coming up stairs." "One of them had a paper in his hands." "She went to the kitchen to the cook, [to prepare the drink;] she was about twenty minutes going down, waiting for the drink; and as she was returning, she met the gentleman coming down, who went up with a paper in his hand, returning down stairs; he went out of the front door; as she got to Mr. Mason's door, Mrs. Jones came out, took the drink and went back into the room, and shut the door, leaving the witness in the entry. Mrs. Jones said nothing." "A few minutes after this, she heard of Mr. Mason's death. Mrs. Jones told her he was dead." This witness laid him out. Ellen Graham testified, "She was in the parlor of young John Mason, over the street door, and heard the lawyer (Mr. Strong) go out. The carriage was then at the gate; I placed young John in the carriage; when she came back met Mr. George and Mrs. Rebecca Jones on the stairs, who told her Mr. Mason was dead; this was but a few moments after the lawyer left; I should think not more than 15, not much more anyhow." Catherine Riley testified, "On the day Mr. Mason died she furnished a drink in the kitchen; handed it to Mary Murphy, who came down in a hurry for it; heard of his death in less than $\frac{1}{2}$ an hour after this, from the nurse; about $\frac{1}{2}$ an hour between her going up with the drink and her hearing of Mr. Mason's death."

The evidence in the case establishes the following facts : Mr. Mason was in the perfect possession of his intellect, down to and including the 22d of September, 1839. As early as the 10th or 12th of September, he was conscious that he must die soon thereafter, and that he might die at any moment; the subject of making a will was thought of by him, and down to and including the 22d, he had determined not to make a will. From the 22d down to the afternoon of the 25th, his body and mind rapidly decayed.

Alston *v.* Jones.

On the night of the 25th, down to and including 11 o'clock on the 26th, Mr. Mason's mind was in the past, not in the present; his mind saw and spoke to and of subjects as being present, which were not present; spoke of the existence of facts, which were not facts. Disease and pain had placed him in that state of superannuation, when the physical lives beyond the mental; when the mind's only present is the past. Mr. Strong entered Mr. Mason's bed room at half past 11 o'clock, and left it again at 5 minutes before 12 o'clock. Of the 25 minutes Mr. Strong was in Mr. Mason's room, 20 of them were consumed in reading the will. The glass of water which Dr. Berger gave Mr. Mason in Mr. Strong's presence, after the will had been signed, was the last drink which Dr. Berger gave to Mr. Mason; and Mr. Mason died within five minutes after that drink. Mr. Strong reached the street 3 minutes before 12 o'clock. At 12 o'clock Mr. Mason was dead. The will was signed by Mr. Mason not more than fifteen minutes before his death.

The only remaining question of fact is, whether Mr. Mason, notwithstanding all the foregoing established facts, was, during the twenty minutes Mr. Strong was reading the will, and the time Mr. Mason was signing and acknowledging it, restored to the possession of a disposing mind, memory and understanding; for if he was, the will is good. The testimony of Mr. Strong, while it shows the presence of approaching death, making rapidity of action on the part of Mr. Strong necessary, states facts, which to an intelligent mind, not cognizant of the occurences of the previous twenty-four hours, were consistent with the possession by Mr. Mason of disposing mind and memory. Yet, those facts are not inconsistent with the mechanical performance by Mr. Mason of habitual business acts, in the absence of mental direction. The jury, by their verdict, found the existence of the latter fact. In my judgment, the evidence fully justifies such conclusion. No direction of a court could as strongly indicate the result the jury arrived at, as the simple statement of the evidence in the chronological order of the events.

The motion for a new trial should be denied with costs.

Alston *v.* Jones.

ROOSEVELT, J. This controversy, in one form or another, has been pending more than thirteen years. The will, which is the source and subject of it, was, though not without hesitation, as his opinion shows, finally admitted to probate by the late surrogate in 1840 ; a decision six years afterwards declared to be erroneous, and reversed by the supreme court. The reversal being founded on a question of fact, a trial by jury became necessary, and was ordered accordingly. Having resulted unfavorably to the alleged will, a motion is now made for a new trial. It is made on the part of the Messrs. Jones and others claiming under the instrument, and alleging it to be the will of John Mason. The jury, under the charge of the judge, upon the evidence, gave their verdict against the instrument, declaring, in substance, that it was executed "without knowledge," and was not the will of the alleged testator. And the question now is, could they, or could any other twelve impartial men, on the case presented, or on any case likely to be presented, have arrived, or be likely to arrive, at any different or more favorable result? If not, a new trial would not only be an idle, but, considering the long litigation already encountered, an unjustifiable, vexatious and expensive ceremony. One general term of the supreme court, as we have seen, has already decided, and the decision has been neither reversed nor appealed from, that upon the evidence presented before the surrogate, and returned to the judges at that term, the instrument in their opinion was not sufficiently proved to be the will of John Mason. On the jury trial which followed, nearly all the matters previously proved, certainly all the matters of any importance, were again given in evidence. Upon them, and the additional proofs, which are not pretended to have strengthened the case of the will, the jury found not only negatively that the instrument in question was not sufficiently proved; but affirmatively that it was not the will of John Mason. What ground is there then, or according to the usual practice of the court can there be, for what, if granted, must virtually be a third or rather a fourth trial of the same issue? The counsel for the supporters of the alleged will rests his motion mainly on the assumption, which he has endeavored to main-

Alston *v.* Jones.

tain by argument, that the charge of the judge and the verdict of the jury were not warranted by the evidence. On reading the instrument in question, it will be seen that the parties chiefly interested to uphold its validity bore no relationship by blood to Mr. Mason, and that the wife of one of them, although a daughter of Mr. Mason, was no longer living; they also admit, as I read the evidence, that Mr. Mason never spoke to them about a will, and that, on their part, they never ventured to speak to Mr. Mason on that subject. They nevertheless procured a will to be drawn, and drawn not by his but by their lawyer, for a dying man, who shortly before had himself expressed a belief that he should not (as he did not) survive the following day. And the question is, in thus interfering to the prejudice of other members of the testator's family, and among them two sons and a daughter, and the children of a deceased daughter, did they act under instructions given by the testator? None direct are pretended. The substance of the evidence on this point (if such diluted hearsay can be called evidence) is that Mr. Strong, the lawyer who drew the paper, tells the jury that Messrs. Isaac and George Jones told him that Mrs. Rebecca Jones told them that Mr. Mason told her that he wished a will drawn with all possible dispatch. (Folios 97, 109, 110.) Mr. Strong, when asked, "Did they say whether Mr. Mason had himself personally directed them, or either of them, to get a will drawn for him?" frankly answers, "No, they did not, and I understand decidedly the contrary." He even goes further, and adds: "It is proper for me to explain that I understood that the Messrs. Jones had been looking for me in the afternoon of the day on which I received the instructions from them, and had not found me; they told me that after looking for, and not finding me, they had returned again to see (not Mr. Mason, be it observed, but) Mrs. Jones, and to hear from her instructions so that they might not be mistaken in them, and had again got the instructions from her, before they saw me in the evening." The Mrs. Jones referred to, he says he understood afterwards was Mrs. Rebecca Jones, the widow of the late Isaac C. Jones, and one of the daughters of Mr. Mason. These instructions, if

Alston *v.* Jones.

given, it is admitted, were not written by the testator, nor were they dictated by him and taken down and read over to him at the time, or at any time. Nor after they had been taken down by Mr. Strong, from the lips of the Messrs. Jones, and a draft will, "in great haste," as Mr. Strong says, had been prepared from them, (fol. 104,) were either they or the draft submitted to or seen by Mr. Mason. The draft was made at the instance of the Messrs. Jones, in haste, the same evening on which the instructions were given; "and the next morning (says Mr. Strong) I read it over to them." No alteration was made in that draft : none recollected by the witness. The will produced was engrossed from it. The result then is, that as the Messrs. Jones conveyed the instructions, and as Mr. Strong, as he testifies, "took down the instructions as they were delivered to him, faithfully and correctly, and drafted the will accordingly, (that is, according to the instructions,) to the best of his ability, regarding the great haste in which it was required to be done ;" the result, I say, is that the Messrs. Jones instructed Mr. Strong, in substance, to draw precisely such an instrument as that which is now set up as the last will and testament of John Mason. What, then, as thus ascertained by the engrossed instrument itself, faithfully and correctly drawn according to the instructions ; what, I say, did the Messrs. Jones, among other things, direct Mr. Strong, their lawyer, to do ? They instructed Mr. Strong, in drawing the will, to insert a provision, giving—for although engrossed with some circumlocution, that is its admitted purpose and legal effect—to Mr. Geo. Jones, the husband of a deceased daughter, one full share of Mr. Mason's real estate for life, and one full share of his personal estate forever, to be taken moreover from the testator's own blood, to whom otherwise it would legally and naturally have gone, and by a complex will to be transferred to one who, without it, by the law of the land was entitled to receive, and would have received nothing. Does any one believe, or, in the absence of the most positive proof, can any one believe, that Mr. Mason, on the afternoon before he died, or at any time, dictated to Mrs. Rebecca Jones, or to any body else, instructions, comprehending, among other things, such a dispo-

sition of his estate? Did Mr. George Jones himself, although about his bedside, and although insisting upon the dying man's perfect competency up to the moment even of actual dissolution, venture to inquire of this man " of sound mind and memory, and good understanding," (see Dr. Berger's testimony, fols. 15, 22, 53,) whether such a disposition so unusual, and seemingly at least so unnatural, was suggested by him, or was in accordance with his wishes? He does not pretend that he did so; on the contrary, it would seem he never opened his lips to Mr. Mason on the subject. Was it because Mr. Mason was not communicative? Dr. Berger swears that "he talked a good deal." Was it because the disease affected the patient's brain? Dr. Berger swears that he never showed " any indications of temporary or other aberration of mind; never that he (the doctor) could perceive." Was it because of physical weakness? Dr. Berger again swears that " there was not any apparent diminution of his strength during his confinement," or " not much that he could perceive;" and " no material alteration in his countenance down to the time of his death." Was it because Mr. George Jones had no opportunity of introducing the subject or making the inquiry? Dr. Berger swears that Mr. George Jones " sat up" with his patient the last night of his life, and " was present in the room when he died." Here, then, was a son-in-law, (the husband of a deceased daughter,) returning at 8 or 9 o'clock on Wednesday evening from the office of his lawyer, where he had been engaged, we may presume, for some considerable time, in giving instructions for and discussing and virtually dictating the last will and testament of John Mason; and among its provisions, one disposing, in favor of Mr. George Jones individually, of between one and two hundred thousand dollars; returning, I say, from such a consultation about John Mason's affairs to the bedside of that same John Mason, he at the time as is contended in the full possession of all his faculties, bodily and mental, and, if Dr. Berger's "belief" is to be relied on, capable even of understanding " perfectly" a long complex instrument which, whatever may be the confident opinion of counsel to the contrary, is somewhat hard to be understood, and yet during the whole night,

with every facility as we have seen for communication, not lisping a syllable to this "talkative" old gentleman about the important consultation, professedly on his behalf, in which four persons (himself of the number) had just been engaged. He asked no questions, and made no communication. He "suppressed" the whole transaction; at a time too when, had it been communicated, Mr. Mason could have "understood it perfectly." He waited, it would seem, in absolute silence, from about 8 o'clock on Wednesday evening till nearly noon the next day, when the engrossed will at length was finished; and then, as one of the counsel on the trial very truly expressed it, commenced a race with death. Mr. Strong, the lawyer who had never before seen Mr. Mason on the subject, hurried up with the important document, in a carriage, between 11 and 12 o'clock on Thursday morning, not to submit it to; but to have it executed by, the automaton testator; automaton, I say, for although able to understand the instrument "perfectly," he was treated as an automaton by all the actors in the scene. On entering the house, such was the sense of urgency with which the Messrs. Jones had impressed him, Mr. Strong, accompanied by one of them, actually ran up stairs to the sick man's room, and commenced the reading without a moment's delay. And although Dr. Berger, who was present, did not as he says "pay much attention," and had forgotten whether he (Mr. Strong) made pauses in reading it or not," yet Mr. Strong himself, whose memory is better, says positively, "I read the will through without pausing": "I endeavored to, and I believe I did; read the will audibly, correctly, and distinctly; but at the same time having noticed that Mr. Mason appeared to labor very much in breathing, and understanding that he was near his end, I read it with as much rapidity as I deemed to be compatible with a sense of my duty in reading the will to him:" At the end of the entire reading, (and much stress is laid on the circumstance, as evidence of his having given the previous instructions,) Mr. Mason said he understood it "perfectly," and that it was correct, and "immediately" signed it; and died in less than fifty, I think in less than fifteen minutes thereafter, Mr. George Jones taking the custody of the

instrument. But whether these supposed expressions of Mr. Mason were or were not in the form of mere assents to leading questions, does not distinctly appear, except that Mr. Strong is confident that Mr. Mason used the word "perfectly."

Assuming that Mr. Mason, laboring himself under a mortal paroxysm, on the instant after listening for the first time to one continuous rapid reading of a long special testamentary instrument, by a lawyer out of breath, said ever so distinctly that he "perfectly understood" its contents, he obviously uttered an impossibility, and demonstrated, as it seems to me, by the most conclusive evidence, his incapacity to understand it at all. No man, I may say no lawyer, after such a reading of such an instrument, (never having perused a previous draft,) could say he understood it perfectly, unless from a blind impulse of disordered sanity. The jury to whom it was read, and read deliberately, and who were the proper judges of this question, and had a right to act on their own knowledge of the ordinary powers of the human intellect have in effect said that such an observation by Mr. Mason, if made, was in their view conclusive evidence that the dying man in making it, although still retaining to some extent the power of speech, in fact, as Dr. Van Rensselaer testifies, knew not what he said. Swinborne, (vol. 1, p. 189,) speaking of wills made "at the very point of death," and where the party "doth not of his own accord make or declare his testament, but at interrogation of some other, demanding of him whether, &c., answereth yea, or I do so," says they are attended with difficulty. In some cases it is "to be presumed that the testator did answer yea, rather to deliver himself of the importunity of the demandant, than upon devotion or intent to make his will; because it is for the most part painful and grievous to those that be in that extremity, to speak, or be demanded any question; and, therefore, are ready to answer yea to any question almost, that they may be quiet: which advantage crafty and covetous persons knowing very well are then most busy, and do labor with tooth and nail to procure the sick person to yield to their demands," &c. Such an instrument, where the sick person merely yields to importunity, "being then passing to

Alston *v.* Jones.

another world," although he answereth yea, is "to be deemed for no testament." The jury, in the case of Mr. Mason, have in effect found that if he used the expressions attributed to him, he used them "without knowledge." And this conclusion, it seems to me, is strongly, and I think impregnably, fortified by the corroborating and corroborated testimony of Dr. Van Rensselaer, who saw the patient and conversed with him about an hour or an hour and a half before he died, or before he signed the disputed instrument, and who gives us precisely what occurred on that occasion, and his conclusion from it, formed at the time, that Mr. Mason, whatever he might have been before, was not then of sound mind. The testimony of the three female witnesses is to the same effect. But this is not all. Dr. Van Rensselaer swears that Mrs. Rebecca Jones came out of the room as he entered, and that the nurse was in, and remained in during the interview; and neither of these persons pretends to contradict the doctor's statement, either as to the particulars of the interview, or as to the precise time when it took place. Counsel it is true have argued, not that Dr. Van Rensselaer has given a false version of the interview, but that he has made, or rather that he must have made, a mistake in fixing the day of its occurrence. And are we to take argument, or rather mere unsupported suggestion, for evidence? And that, too, when the witness has given us the names or designations of no less than three, I may say four, persons to rectify the error of date, if there was one? He says a domestic opened the street door for him; another domestic whom he then and then only attended was sick in the attic; a third domestic, acting as nurse, was in Mr. Mason's room, and participated in the conversation; and lastly, Mrs. Jones herself (and her affidavit was admissible on a motion for a new trial on the ground of surprise) came out of Mr. Mason's room as he (the witness) entered. Not one of the four— all living—has ventured to swear (or, for aught that appears, has even been applied to for her affidavit) that there was any mistake in the doctor's chronology; and yet, on this motion for a new trial, we are called upon by counsel, without evidence and against evidence, to assume that " Dr. Van Rensselaer, on whom

Alston *v.* Jones.

the judge relies, has mistaken the day of his visit," and that his testimony on that account was a surprise upon them. No such imaginary mistake was urged or suggested on the trial. It was not thought of then ; it is not sworn to now. In my view of the evidence, taken in connection with the absence of any affidavit, there is not the slightest color for the suggestion. Here, then, on the morning of the 26th September, was Mr. Mason, in the language of Dr. Van Rensselaer, " a very ill man," and in that of Dr. Berger, "a very sick man," so sick that he, Dr. Berger, " had announced to the family, he thinks between 11 and 12, that he was dying ; and not only a very sick, ill and dying man, but during most of the morning, whatever may be Dr. Berger's opinion, in a state of mental aberration, " talking and muttering to himself" incoherently " about horses and chemicals," and such like matters, and giving the most unmistakeable indications to induce not only the female domestics, but an experienced physician, to consider him incapable of " carrying on a conversation." At this dying hour, between 11 and 12 o'clock, in the midst of a " severe paroxysm," braced up by pillows behind, and rods or cords · before, the ear of the patient is saluted for the first time by the voice of a lawyer, announcing that he " had prepared a will for him," and proposing to read it ; and it is conceded that the dying man's language on the occasion, in connection with the contents of the instrument, is conclusive evidence that his desire, among other things, was, and that he had so instructed Mrs. Jones to say to the Messrs. Jones, that Mr. George Jones should take one full share of his estate, as to the realty for life, with remainder to his children, and as to the personalty, absolutely and forever ; in other words, a bequest to himself outright, equivalent to more than $100,000. I shall assume, although not certain, that after the reading of the instrument, in answer to the lawyer's question whether he understood it, Mr. Mason's expression was not merely a nod, but a " yes," or " perfectly ;" and yet, with all deference, I must be permitted to repeat, " it was impossible," impossible to any one, but more especially to one whose body was " suffering," whose mind was " wandering," whose speech was " muttering," and whose whole being, as had

Alston *v.* Jones.

just been "announced," and as the result in a few moments demonstrated, was on the verge of dissolution. The Messrs. Jones, it is true, stood by, and may have been innocently deceived into a disbelief of the sick man's incapacity. They felt, as the whole evidence shows, and they had, a strong interest. And we all know how difficult it is to convince a man against his will, and how often, although convinced, he remains "of the same opinion still." Even experienced counsel, trained in the school of forensic vicissitudes, sometimes exhibit the same infirmity; and when thwarted, treat the opposition they encounter as judicial blindness, and in some instances, to oblige their clients, as a personal offense. But neither belief nor disbelief can alter the indubitable facts of the case, or make that credible which in its nature is palpably absurd; to wit, that a special testamentary instrument, sixteen folios in length, creating trusts, powers, future estates, contingent limitations and executory devises, drawn "in haste" necessarily, and necessarily read with "much rapidity," and never submitted or discussed before, in draft or otherwise, was on the instant "perfectly understood" by a dying man, after a single reading, and that without pause, observation or explanation. True, Dr. Berger, who was present at the ceremony, when asked on his first examination what he thought was the state of Mr. Mason's mind at the time the will was executed, also answered that "I believe he understood it perfectly; his understanding was good." But is it not obvious that the easy faith of one witness, especially when in opposition to facts distinctly proved by four others, is insufficient to establish an impossibility? Dr. Berger, moreover, himself admits that his patient, at the time, was in the midst of a "paroxysm of great severity," that his "suffering was very great," and that he had announced to the family that "he was dying," and that he, the doctor, had "forgotten," when interrogated as to Mr. Strong's mode of reading the will, "whether he made pauses in reading it or not," and that "he did not pay much attention." How, then, could he say, with any claim to respect for his opinion, that "Mr. Mason understood it perfectly." Mr. Mason upon the doctor's own statement, was unable to

understand it perfectly; and the doctor himself, upon his own statement, was unable to say so. The language used by the doctor, it is manifest, was one of those loose modes of expression sometimes inadvertently adopted by witnesses, and is to be taken with the same sort of allowance as his answer to another interrogatory, in which he says, "He, Mr. Mason, was able to sit up (at 12 o'clock;) he sat up for five minutes before he died;" when the fact was, as the proof subsequently showed, that he could not lie down, but for two or three days had been artificially bolstered up, both before and behind, to prevent suffocation. But again, I ask, if Mr. Mason's understanding was so good, and his powers of speech so unimpaired, and if, when the doctor "was there," he "talked a good deal," and "usually upon general subjects," and "never showed any indications" of mental aberration, as the doctor says; why was not the subject of his testamentary instructions introduced, in the whole interval, between the afternoon of the 25th and 7 o'clock in the morning of the 26th, while the doctor and Mr. George Jones, as the former swears, were almost uninterruptedly with him? And why again, at 7 o'clock, when the draft will had been prepared for examination, was it not submitted to Mr. Mason, who was to execute it, instead of the Messrs. Jones, who were to take under it? Acts, we are told, speak louder than words, and it might be added, an ounce of fact is worth a pound of opinion. These maxims are not only common sense, but well established law. (*Clark* v. *Fisher*, 1 *Paige*, 173.) Taking them as a guide, the case, as it seems to me, independently of the testimony of Dr. Van Rensselaer and the three female witnesses, contains a perfect cognovit of the testamentary incapacity of the alleged testator, for eighteen, if not twenty-four hours, before his death, and fully justified the jury in finding, as they did, that the instrument produced, although bearing the unconscious signature, was not the will of John Mason.

My conclusion is, that this motion for a new trial should be denied, and that a judgment pursuant to the revised statutes should be entered, declaring that the paper propounded as a will is not the will of John Mason, and ordering that the record

The People v. Board of Education of New-York.

and probate thereof be annulled and revoked, and that this determination be certified to the surrogate, to be carried into effect according to law.

MITCHELL, P. J., dissented.

New trial denied.

[NEW-YORK GENERAL TERM, December 5, 1853. *Mitchell, Roosevelt* and *Morris*, Justices.]